IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KENNITH ROGER QUICKLE, | ) | CASE NO.: 4:25-cv-01944-RJS |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| FRANK BISIGNANO, | ) | **AND ORDER** |
| COMMISSIONER OF SOCIAL SEURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Kennith Roger Quickle ("Quickle"), seeks judicial review of the final decision of the Commissioner of Social Security denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act and supplemental security income ("SSI") under Title XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405 (g) and 1383(c)(3). The parties consented to the jurisdiction of the magistrate judge pursuant to 28 U.S.C. § 636(c)(1). As substantial evidence supports the ALJ's decision and because Quickle has failed to identify any error of law in the ALJ's evaluation of his case the Commissioner's final decision is AFFIRMED.

## II.      Procedural History

On February 10, 2023, Quickle filed applications for DIB and SSI alleging his disability began July 15, 2022. (Tr. 225-31). The claims were denied initially and on reconsideration. (Tr. 64, 75, 87, 97). On February 9, 2024, he requested a hearing before an ALJ. (Tr. 133-34). Quickle, with representation, and a vocational expert ("VE") testified before the ALJ on August 20, 2024. (Tr. 41-63).

1

On September 27, 2024, the ALJ issued a written decision finding Quickle not disabled. (Tr. 22-33). The Appeals Council denied her request for review on November 8, 2024 thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-6). Quickle timely instituted this action on September 15, 2025. (ECF Doc. 1). He asserts two assignments of error:

1. The ALJ's (sic) failed to provide sufficient analysis in support of finding Plaintiff's subjective reporting did not support limitations to the extent alleged.

2. The ALJ failed to explain the exclusion of limitations opined by Dr. Arnold from the RFC despite finding her opinion persuasive.

**III.    Evidence**

**A.  Personal, Educational and Vocational Evidence.**

Quickle was born on August 18, 1978, and was 43 years old on the alleged onset date, making him a younger individual age 18 to 49 according to agency regulations. (Tr. 31). He has at least a high school education. (Tr. 32). He has past relevant work as a gluing machine feeder, DOT 569.686-038, medium exertional level, SVP 2; as an industrial truck operator, DOT 921.683-050, medium exertional level, SVP 3; and as a machine feeder, DOT 690.686-010, medium exertional level, SVP 2. (Tr. 31).

**B.  Relevant Medical Evidence**

On October 4, 2022, Quickle presented to the St. Elizabeth Boardman Emergency Department complaining of restless legs, vomiting, and diarrhea. (Tr. 723).  He noted a history of heroin abuse, but he reported receiving his first dose of suboxone that day. (*Id.*). He underwent an abdominal CT which revealed a 4 cm isodense right renal mass, and neoplastic disease could not be ruled out. (Tr. 725). The CT also showed diverticulosis, but no evidence of diverticulitis.

2

(*Id.*). He was assessed with right renal mass, diverticulosis, heroin abuse, leg cramps, and generalized abdominal pain. (Tr. 727).

Quickle returned to the emergency department on October 9, 2022, complaining of abdominal pain, nausea, and vomiting. (Tr. 718). He was assessed with nausea and vomiting, generalized abdominal pain, and right kidney mass. (Tr. 722). He again returned on October 11, 2022, and reported a past medical history significant for endocarditis, hypertension, chronic hepatitis C, restless leg syndrome, multifocal pneumonia, COVID-19, and polysubstance abuse. (Tr. 691). He reported he was no longer taking suboxone and had not used any drug since October 3, 2022, although he had a positive drug screen for fentanyl. (Tr. 693). He was experiencing abdominal cramping, nausea, and vomiting. (*Id.*). An abdominal CT showed a heterogeneously enhancing mass left kidney measuring 5.8x4.5x4.7cm located within the upper pole and suspicious for renal cell carcinoma. (Tr. 700). At a November 22, 2022, office visit with his primary care physician, James Enyeart, M.D., he was recommended for surgery to address the renal mass. (Tr. 415).

Quickle presented to the emergency department on January 15, 2023, complaining of chest pain, and noted he had taken two of his wife's nitro pills at home and was provided four baby aspirin by EMS without any relief. (Tr. 453). He admitted to intravenous drug abuse and methamphetamine use, though not in the past several days. (*Id.*). While in the emergency department he experienced an ST elevation myocardial infarction and cardiopulmonary arrest requiring defibrillation and intubation. (Tr. 459). He underwent left heart catheterization with coronary angiography, percutaneous coronary artery intervention of the mid to distal circumflex with a drug-eluting stent and multiple defibrillations. (Tr. 467). His angiographic results showed 100 percent occlusion of the mid to distal circumflex and left ventricle ejection fraction of 40

percent. (Tr. 495). A follow-up echocardiogram post-procedure showed his ejection fraction had improved to 55 to 60 percent, and he was extubated on January 18, 2023. (Tr. 502). Quickle remained hospitalized until February 2, 2023, when he was discharged with outpatient follow-up. (Tr. 659).

On February 6, 2023, Quickle attended an appointment with Zeyad Schwen, M.D., of the Cleveland Clinic Glickman Urological and Kidney Institute. (Tr. 1851-53). Quickle was directed to remain on antiplatelet medication for one year due to his stent placement, and was referred to cardiology to determine the earliest date his blood thinner medication could be stopped so that he could undergo a radical nephrectomy. (Tr. 1852). Given the complex situation involving his recent STEMI and the risk of metastatic disease it was determined that his case should be presented to a Tumor Board. (Tr. 1853).

Quickle attended an appointment with Walter Sweeney, D.O., of Youngstown Specialty Care, LLC, on February 17, 2023, for follow-up and management recommendations for coronary artery disease. (Tr. 443). He denied chest discomfort, dyspnea on exertion, orthopnea, lower extremity edema, palpitations, or presyncopal symptoms. (*Id.*). Dr. Sweeney recommended waiting three months before his proposed nephrectomy. (Tr. 444). Dr. Sweeney also referred Quickle for a work-up for obstructive sleep apnea. (Tr. 445). A kidney CT on March 27, 2023, showed some slight enlargement of his renal mass, but no sign of metastasis (Tr. 3454), so a robotic radical nephrectomy was planned for early June 2023. (Tr. 1854-56). The surgery was performed on June 14, 2023. (Tr. 1500). The pathology report following surgery indicated that the right kidney was excised, and that the margins of excision were free of neoplasm. (Tr. 1511).

At a follow-up appointment with Dr. Schwen on July 3, 2023, Quickle was recommended to follow-up with a CT scan in six months. (Tr. 1864). Quickle presented to the emergency

department on July 10, 2023, due to "drainage of worsening collection of fluid to the lower left abdomen" with associated increase in left lower abdominal pain. (Tr. 1469). An imaging guided soft tissue fluid drain placement was performed. (Tr. 1477). On September 28, 2023, Quickle reported severe pain of the abdomen near the incision with redness and swelling of the abdominal wall starting at umbilicus and extending inferiorly. (Tr. 1664). An abdominal CT showed "pockets of fluid with surrounding inflammation in the left anterior abdominal wall subcutaneous soft tissues." (*Id.*). He was assessed with sepsis due to abdominal wall cellulitis and abscesses. (Tr. 1667). On December 4, 2023, Quickle underwent debridement of an abdominal wall infection. (Tr. 1846).

A split night polysomnography with CPAP/BPAP titration report showed severe obstructive sleep apnea, and noted his BMI was 48.4 kg/m2. (Tr. 2449-50). He was recommended to begin Auto-CPAP therapy. (Tr. 2450). A follow-up abdominal CT was performed on February 29, 2024, which showed soft tissue density deep to the incision site likely representing scar or granulation tissue, with no residual abscess identified. (Tr. 2198). On May 6, 2024, Quickle presented to the Cleveland Clinic Center for Abdominal Core Health for evaluation of a ventral hernia that had been noted on the February 2024 CT within the left rectus sheath. (Tr. 1812). It was determined that his chronic abdominal wall abscess appeared to be resolving and therefore was not a barrier to proceeding with surgery to repair the hernia. (Tr. 1814).

On June 24, 2024, Quickle attended an office visit with Joseph Cataline, M.D., and reported that he was deriving benefit from his CPAP but admitted that he needed to use it more consistently. (Tr. 4032). Quickle had a follow-up appointment regarding his type II diabetes mellitus on August 5, 2024, and noted that due to his rising A1c level he had been prescribed

5

Victoza, and that his blood pressure was controlled. (Tr. 3993). At an August 6, 2024 appointment with the Cleveland Clinic Bariatric and Metabolic Institute, it was noted that with Victoza, Quickle had lost 11 pounds, and his A1c had improved from 8.2 to 7.0. (Tr. 1799).

Quickle attended a mental health consultative examination with Carolyn Arnold, Psy.D., on November 1, 2023. (Tr. 1648-52). Quickle indicated he had previous diagnosis of bipolar disorder and severe depression from 2005. (Tr. 1649). He reported that he had mood shifts when he felt stressed and overwhelmed, and that he becomes very anxious, withdrawn, angry, hateful, sad and worried, with low motivation and low energy. (*Id.*). He has benefitted from counseling, including drug counseling, in the past, but has not been engaged with it since 2008. (*Id.*). He claimed that he stopped using illegal drugs in 2021. (*Id.*). He reported spending time with family but reported no outside friends or other social activities. (Tr. 1651). Dr. Arnold diagnosed Quickle with bipolar disorder, depression and anxiety. (*Id.*).

Quickle underwent a mental health diagnostic evaluation on April 1, 2024, complaining of excessive worry mostly relating to his family situation, irritability, sleep issues, and feeling on edge and fearful of having another heart attack. (Tr. 4502). He was assessed with generalized anxiety disorder and was recommended for individual therapy. (Tr. 4503). At an April 30, 2024 psychotherapy appointment with Jared Sherman, MSW, LSW, he reported he had been getting out of the house more, including to go fishing with his brother. (Tr. 4512). He reported feeling anxious about his wife's health issues at a May 30, 2024 psychotherapy appointment. (Tr. 4516). On July 31, 2024, he continued to feel anxious about his wife's health but noted he had exercised self-control rather than confronting a neighbor about a dispute over plants in his yard. (Tr. 4520).

### C.  Medical Opinion Evidence

#### 1.  State Agency Reviewers

On June 15, 2023, state agency reviewing physician Bruce Hallmann, M.D., opined that Quickle could perform work at the light exertional level, except that he could only frequently climb ramps or stairs, or crawl; he could never climb ladders, ropes, or scaffolds; he should avoid concentrated exposure to extreme cold or heat, humidity, vibration, or fumes, odors, dust, gases, poor ventilation, or other pulmonary irritants; and that he could not drive commercially, work at exposed heights, or work around or operate heavy machinery. (Tr. 71-72). State agency reviewing physician Leon Hughes, M.D., affirmed Dr. Hallmann's opinion on October 2, 2023. (Tr. 91-93).

On December 6, 2023, state agency reviewing psychologist Irma Johnston, Psy.D., opined that Quickle had mild limitations in the domains of interacting with others and concentration, persistence, and maintaining pace. (Tr. 91). Dr. Johnston further opined that Quickle had no limitations in the domains of understanding, remembering, and applying information, and adapting or managing oneself. (*Id.*).

### 2. Consultative Examiners

Following the consultative examination conducted November 1, 2023, Dr. Arnold opined that Quickle was able to understand, remember, and carry out instructions, follow a conversation, think abstractly, and apply reason. (Tr. 1651). Dr. Arnold felt Quickle's short- and long-term memories were intact and that his mental flexibility was somewhat intact. (*Id.*). Dr. Arnold felt that Quickle was able to sustain concentration and show persistence with simple tasks for a shorter period of time, and multistep tasks for a short period of time. (Tr. 1652). Quickle did appear to be distractible, mentally fatigued, and had difficulty with calculations. (*Id.*). Quickle had a history of interacting well with coworkers and supervisors and responding adequately to

7

workplace pressures, though he now adapts to limitations by remaining at home, self-isolating and reducing activities. (*Id.*).

### 3. Medical Source Statement

On August 14, 2024, Jared Sherman, MSW, LSW, indicated that he was unable to formulate an opinion regarding Quickle's mental health due to limited sessions. (Tr. 4524-28). He did, however, note that Quickle showed a normal level of consciousness and comprehension, with appropriate thought content and mildly anxious mood. (*Id.*).

### D. Administrative Hearing Evidence

On August 20, 2024, Quickle testified that he is married and that he lives with his wife and mother. (Tr. 46-47). He completed the 9th grade and has a GED. (Tr. 47). He has served three prison sentences but has been out since 2017. (*Id.*). He believes that he became disabled on July 15, 2022, due to issues with the L4 disc in his back. (Tr. 50). Since that time his breathing issues have grown worse, he is unable to bend or stop like he used to do, and he has had problems with his legs. (Tr. 51). He struggles to climb stairs or to walk any distance, and he is unable to play with his kids and grandkids like he used to do. (*Id.*). He gets very anxious around others, such as at the grocery store, and he will start "pouring sweat" while he is there. (*Id.*). He struggles to do chores such as laundry, and he struggles to shower because he is unable to bend over. (Tr. 52).

Quickle further stated that he has had multiple infections in his stomach and is currently dealing with a hernia. (*Id.*). He is unable to mow the yard or garden like he used to do. (*Id.*). Sitting hurts his back, and he has developed neuropathy. (*Id.*). He has recently started getting treatment for his mental health again. (*Id.*). During the day he will generally try to perform some

household chores, and he takes turns with his wife and mother making dinner. (Tr. 53). Quickle testified that he has not used illegal drugs since he was released from prison in 2017. (*Id.*). He was told that his recent heart attack may have been caused by his drug abuse, but the issues with his kidneys were not. (Tr. 54).

Under questioning by his attorney Quickle testified that when he stands for a while his neuropathy feels like shock waves shooting up his legs. (*Id.*). When he bends over, he becomes out of breath and will get dizzy. (Tr. 55). He is 5'5" and weighs 289 pounds but he has lost 10 pounds since he started taking Victoza. (*Id.*).

Once Quickle's testimony concluded, VE Deborah Lee testified. (Tr. 56-61). VE Lee classified Quickle's past work to include gluing machine feeder, DOT 569.686-038, medium exertional level, SVP 2; industrial truck operator, DOT 921.683-050, medium exertional level, SVP 3; and machine feeder, DOT 690.686-010, medium exertional level, SVP 2. (Tr. 57-58).

For her first hypothetical the ALJ asked the VE to consider an individual of the claimant's age and education, with his past work, who was limited to work at the light exertional level and was further limited to frequently climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; frequently crawling; never working at unprotected heights, around moving mechanical parts, or operating a motor vehicle; only occasional exposure to humidity and wetness; avoiding concentrated exposure to vibrations, dust, odors, fumes, and pulmonary irritants; no exposure to extreme cold or extreme heat. (Tr. 58). The VE opined that this individual would be able to perform Quickle's prior job as a machine feeder as he had performed it, but not as it is generally performed in the national economy and would be unable to perform Quickle's other past work. (Tr. 58-59). This individual would also be able to perform other jobs such as cleaner/housekeeping, DOT 323.687-014, light exertional level, SVP 2, with

9

approximately 175,000 jobs in the national economy; as assembler of small parts, DOT 706.684-022, light exertional level, SVP 2, with 67,000 jobs in the national economy; and as an inspector/hand packager, DOT 559.687-074, light exertional level, SVP 2, with 83,000 jobs in the national economy. (Tr. 59).

For her second hypothetical the ALJ asked the VE to consider all of the same limitations from the first hypothetical, except that this individual would be further limited to only four hours of standing and walking in an eight-hour workday. (*Id.*). The VE opined that this individual could work as a mail clerk, DOT 209.687-026, light exertional level, SVP 2, with approximately 19,000 jobs in the national economy; as a merchandise marker DOT 209.587-034, light exertional level, SVP 2, with approximately 114,000 jobs in the national economy; or as a cashier, where a stool or chair is provided, DOT 211.462-010, light exertional level, SVP 2, with approximately 198,000 jobs in the national economy. (Tr. 60). The VE further opined that if the hypothetical individual were further restricted to simple, routine tasks, these same positions would be available. (Tr. 61).

## IV.     The ALJ's Decision

In her decision dated September 27, 2024, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.

2. The claimant has not engaged in substantial gainful activity since July 15, 2022, the alleged onset date. (20 CFR 404.1571 *et seq.* and 416.971 *et seq.*).

3. The claimant has the following severe impairments: Coronary artery disease status post myocardial infarction, obesity, kidney cancer, liver disease, drug abuse, bipolar depression, and anxiety (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR

10

Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except standing/walking 4 hours in an 8-hour workday, can climb ramps and stairs frequently, never climb ladders, ropes or scaffolds, can frequently crawl, never work at unprotected heights, never moving mechanical parts, and never operating a motor vehicle. Occasional exposure to humidity and wetness, avoid concentrated exposure to dust, odors, fumes and pulmonary irritants; never exposure to extreme cold or extreme heat, and avoid concentrated exposure to vibrations, and can perform simple, routine tasks.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on August 18, 1978 and was 439 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969 and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 15, 2022, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 99-115).

**V.      Law and Analysis**

11

### A. Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1. whether the claimant is engaged in substantial gainful activity;

2. if not, whether the claimant has a severe impairment or combination of impairments;

3. if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4. if not, whether the claimant can perform their past relevant work in light of his RFC; and

5. if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v)[1]; *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B. Standard of Review

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might

---

[1] The regulations governing DIB claims are found in 20 C.F.R. § 404, *et seq.* and the regulations governing SSI claims are found in 20 C.F.R. § 416, *et seq.* Generally, these regulations are duplicates and establish the same analytical framework. For ease of analysis, I will cite only to the relevant regulations in 20 C.F.R. § 404, *et seq.* unless there is a relevant difference in the regulations.

accept as adequate to support a conclusion.'" *Id.*, quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the

13

court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012).

## VI.      Discussion

Quickle raises two issues for this Court's review:

1. Whether the ALJ fail to provide sufficient analysis in support of finding Plaintiff's subjective reporting did not support limitations to the extent alleged?

2. Whether the ALJ fail to explain the exclusion of limitations opined by Dr. Arnold from the RFC despite finding her opinions persuasive?

(ECF Doc. 9, p. 3).

### a. The ALJ properly evaluated Quickle's subjective complaints and provided substantial evidence in support of the RFC.

Quickle argues that the ALJ failed to properly evaluate the subjective allegations he raised at his hearing including worsening breathing issues, difficulty stooping and bending, back pain, his inability to climb stairs or walk long distances, anxiety around others such as when grocery shopping, his hernia that has caused multiple infections, and neuropathy impacting his ability to stand. (*Id.* at pp. 8-9). He contends the ALJ failed to articulate her analysis of these allegations and thereby did not comply with the mandates of 20 C.F.R. §§ 404.1529(c)(3) and 416.929(C)(3). (*Id.* at p. 9). In Quickle's view, beyond insufficient boilerplate language, the ALJ did not provide an explanation for why she discredited his testimony, a lack that rises to error. (*Id.* at p. 10). Quickle asserts that the medical evidence could reasonably cause the difficulties to which he testified, and without an analysis of where there are conflicts between his subjective allegations and the record, remand is warranted. (*Id.* at pp. 10-11). Finally, Quickle submits that the ALJ's error is prejudicial because the RFC she found failed to take into account Quickle's

14

subjective complaints, and had she considered those allegations properly, the RFC would have been disabling. (*Id.* at pp. 12-13).

The Commissioner responds by asserting that the ALJ's decision applied multiple pertinent factors listed under 20 C.F.R. § 404.1529(c)(3) and drew conclusions about what limitations were supported by the record, properly fulfilling her mandate. (ECF Doc. 11, pp. 6-7). The Commissioner argues that the ALJ cited examination findings that were unremarkable, or at least inconsistent with Quickle's subjective allegations, and properly relied on those inconsistencies in determining his RFC. (*Id.* at p. 7). The ALJ further referenced Quickle's daily activities and his response to various treatments when assessing his RFC, and in the Commissioner's view, this satisfied the requirement for substantial evidence to support her findings. (*Id.* at pp. 7-8). Quickle responds to these arguments by writing that the Commissioner offers only post-hoc rationalizations in support of the ALJ's decision, and that such statements are not sufficient to build a logical bridge from the evidence to the RFC. (ECF Doc. 12, p. 2).

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms. *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989). Nevertheless, an ALJ is not required to accept a claimant's subjective symptom complaints and may properly discount the claimant's testimony about his/her symptoms when it is inconsistent with objective medical and other evidence.[2] *See*

---

[2] In explaining the importance of "other evidence," SSR 16-3p provides that:

> We will not evaluate an individual's symptoms based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled. . . . If we cannot make a disability determination or decision that is fully favorable based solely on objective medical evidence, then we carefully consider other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms. Other evidence that we will consider includes statements from the individual, medical sources, and any other sources that

15

*Jones*, 336 F.3d at 475-76; SSR 16-3p, ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence."). In evaluating a claimant's subjective symptom complaints, an ALJ may consider several factors, including the claimant's daily activities, the nature of the claimant's symptoms, the claimant's efforts to alleviate his/her symptoms, the type and efficacy of any treatment, and any other factors concerning the claimant's functional limitations and restrictions. SSR 16-3p; 20 C.F.R. § 416.929(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).

If an ALJ discounts or rejects a claimant's subjective complaints, he must state clearly his/her reasons for doing so. *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). Nevertheless, an ALJ's decision need not explicitly discuss each of the factors. *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)). While the ALJ must discuss significant evidence supporting his/her decision and explain his/her conclusions with sufficient detail to permit meaningful review, there is no requirement that the ALJ incorporate all the information upon which he relied into a single tidy paragraph. *See Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (6th Cir. 2010) (noting that the court "read[s] the ALJ's decision as a whole and with common sense").

---

might have information about the individual's symptoms, including agency personnel, as well as the factors set forth in our regulations.
SSR 16-3p.

16

In this matter, the ALJ clearly considered several of the enumerated factors in evaluating Quickle's subjective complaints. First, the ALJ assessed some of Quickle's activities of daily living, noting that Quickle had been playing pool with his brother (Tr. 28), had been going fishing and "doing things to enjoy himself" (Tr. 30), and had apparently been gardening leading to a dispute with his neighbor regarding his cucumber plants (*Id.*). The ALJ also noted his treatment protocols when assessing his subjective complaints, specifically noting extensive treatment following his cardiac arrest that allowed him to stabilize before discharge (Tr. 28), his treatment for his abdominal pain and inflammation that led to his discharge without pain and significantly decreased drainage (*Id.*), his management of obstructive sleep apnea with CPAP (Tr. 29), his prescription for Victoza which had led to weight loss and greater control of his diabetes (*Id.*), and his dietary changes that had also contributed to weight loss and diabetes management, and had also improved kidney function, with a significant decrease in his creatine level (*Id.*). After considering these factors the ALJ found limitations in Quickle's RFC consistent with the state agency medical consultant opinions that she found persuasive but added greater restriction on his ability to stand and walk that were consistent with his complaints. (*Id.*).

Quickle argued that the Commissioner injected post-hoc rationalizations into his brief to buttress the ALJ's decision, and there is some merit to that point as the Commissioner wrote:

> For instance the record reflects that Plaintiff displayed full range of motion, full strength, a normal gait, no pain with walking, and/or normal function (*see, e.g.*, Tr. 419, 455, 472, 1318, 1336, 1461, 1514, 1679). These findings undermine Plaintiff's allegations regarding exertional or postural limitations. In terms of respiratory issues, Plaintiff often exhibited clear lungs, no respiratory distress, normal respiratory effort and/or no shortness of breath (*see, e.g.*, 44, 455, 1318, 1400, 1405, 1470, 1483, 1484, 1506, 1663, 1670). These finding are incongruous with his claims of disabling level breathing issues.

17

(ECF Doc. 11, p. 7). Notwithstanding these references to the record that were not raised by the ALJ, and as noted above, the ALJ did provide substantial evidence, independent of the post hoc rationalizations, in support of her RFC. That evidence contemplated the necessary enumerated factors when assessing Quickle's subjective complaints, to overcome the low threshold for sufficiency. See *Biestek,* at 1154 (2019). Applying that appropriate deference to the ALJ's decision, I affirm on this issue.

> **b.   The ALJ properly evaluated the opinion of the consultative examiner, Dr. Carolyn Arnold, Ph.D.**

Quickle argues that the ALJ's RFC finding was inconsistent with Dr. Arnold's opinion that the ALJ found persuasive in that the RFC failed to include social limitations. (ECF Doc. 9, p. 13). Quickle contends that the omission of an explanation for the inconsistencies precludes meaningful review and therefore rises to error. (*Id.*). The explanation the ALJ provides for omitting social limitations appears to be that Quickle reported social interactions with his family, but Quickle argues that does not explain why he would not require social limitations to function in a workplace where there would likely be no family support. (*Id.* at p. 15). Rather, Quickle claims, relying on the explanation that he is able to socialize with supportive family members suggests that he would require social limitations in a work environment. (*Id.* at pp. 15-16).

The Commissioner responds by arguing that Dr. Arnold did not incorporate any specific social interaction limitations into her medical opinion. (ECF Doc. 11, p. 9). Rather, Dr. Arnold wrote that Quickle mostly interacts with family, that he had less difficulty with social interaction in the past, and that he tends to remain home and self-isolate. (*Id.*). These statements do not suggest specific social limitations written in vocational terms, thus, the Commissioner asserts, there were no limitations from Dr. Arnold's opinion that the ALJ could have included in the RFC and there is no error. (*Id.*).

A medical opinion is defined under 20 C.F.R. §404.1527(a)(1) as "[S]tatements from medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical and mental restrictions." Where a medical opinion merely regurgitates a claimant's self-described symptoms, it lacks the reflection of judgment about the nature and severity of the opinion and does not rise to the level of a "medical opinion." See *Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011). Here, in her functional assessment pertaining to social interactions, Dr. Arnold wrote:

> The claimant has limited social interactions, mostly with family. The claimant reported less difficulty with social interactions in the past, a history of interacting well with co-workers and supervisors and responding adequately to workplace pressures by working by himself and away from people. The claimant has adapted to limitations by remaining at home, self-isolating and reducing activities. The reported plan for the future is to get his own place to live.

(Tr. 1652). This paragraph simply restates what Dr. Arnold was told by Quickle during his examination and offers no further judgment with regard to nature of his symptoms, diagnosis or prognosis, no indication of his functional capacity, nor any sense of what restrictions his condition would suggest. Accordingly, it was not necessary for the ALJ to distinguish her RFC determination that lacked social interaction limitations from Dr. Arnold's medical opinion that also provided no specific social restrictions. This issue does not countenance remand.

19

**VII.      Conclusion**

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Quickle's application for DIB and SSI is hereby AFFIRMED.

Dated: June 15, 2026

Reuben J. Sheperd
United States Magistrate Judge